**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| | : | |
| v. | : | |
| | : | NO. 24-274 |
| KEITH WYNN | : | |
| | : | |

**J. Perez**                                                     **September 19, 2025**

<u>**MEMORANDUM**</u>

     Defendant Keith Wynn is charged with one count of possession of a firearm and one count of possession of ammunition, in violation of 18 U.S.C. § 922(g)(1). Currently before the Court is Wynn's motion to suppress the firearm and ammunition recovered during a routine traffic stop of the vehicle in which he was a passenger. For the reasons set forth below, the motion will be granted.

     On June 17, 2025, this Court conducted an evidentiary hearing on Defendant's motion to suppress. *See* ECF No. 49. During defense counsel's cross-examination of Officer Wildsmith, it was revealed that dash camera footage from the officer's patrol vehicle had not been produced in discovery. The Government represented that it was unaware of any such recording and, in light of this issue, the Court granted its request for a continuance of the hearing to determine whether the footage existed. The facts set forth below were developed during the initial phase of the suppression hearing, ECF No. 49, and the bifurcated portion held on July 16, 2025, ECF No. 57. Both the bodycam footage and the dashcam recording are part of the record in this case.

     This Court's decision to grant Defendant's motion turns largely on the credibility of Officer Mark Wildsmith. As factfinder, the Court must determine, as nearly as possible, what *actually* occurred during the traffic stop and subsequent police interactions, rather than accept a narrative that aligns with constitutional form but fails the test of common sense and logic.

## I.    FACTUAL FINDINGS[1]

This case arises out of a traffic stop conducted by Officer Wildsmith on January 16, 2024, around 3:30 p.m. in the area of Byberry and Galloway Streets in Bensalem, Pennsylvania. Officer Wildsmith has served as a patrol officer with the Bensalem Police Department for three years, following six years with the Philadelphia Police Department. ECF No. 49 at 7–8 (June 17, 2025). During his tenure in Philadelphia, he received extensive training as part of his involvement in the Narcotics Enforcement Team. *Id.* at 9. He was assigned to the 24th District, which encompasses parts of Kensington, an area of the city known for violent crime and drug activity. *Id.*

Officer Wildsmith testified that he initiated a traffic stop of a 2020 Chevrolet Equinox (hereinafter "the vehicle") after it made a left turn from the incorrect lane, in violation of Title 75 of the Pennsylvania Motor Vehicle Code, Section 3331, entitled "Required position and method of turning."[2] He testified regarding that alleged traffic violation as follows:

---

[1] On a motion to suppress, the district court sits as fact finder and makes any necessary credibility judgments. *See United States v. Harris*, 507 F.2d 197, 198 (3d Cir. 1975). Factors to consider in determining credibility include:

> (1) The opportunity and ability of the witness to see or hear or know the things about which the witness testifies; (2) The quality of the witness knowledge, understanding, and memory; (3) The witness appearance, behavior, and manner while testifying; (4) Whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice; (5) Any relation the witness may have with a party in the case and any effect that the verdict may have on the witness; (6) Whether the witness said or wrote anything before trial that is different from the witness testimony in court; (7) Whether the witness testimony is consistent or inconsistent with other [believable evidence]; and (8) Any other factors that bear on whether the witness should be believed.

Third Circuit Model Criminal Jury Instructions, Instruction 1.10 Credibility of Witnesses; *see United States v. Thompson*, No. 15-cr-222, 2015 WL 5159180, at *4 (E.D. Pa. Sept. 2, 2015).

[2] 75 Pa. C.S.A. § 3331(b) provides:

> **(b) Left turn.**--The driver of a vehicle intending to turn left shall approach the turn in the extreme left-hand lane lawfully available to traffic moving in the direction of travel of the vehicle. Whenever practicable, the left turn shall be made to the left of the center of the intersection and so as to leave the intersection or location in the extreme left-hand lane lawfully available to traffic moving in the same direction as the vehicle on the roadway being entered.

[OFFICER WILDSMITH]: Yes. So I was travelling on Byberry Road approaching Hulmeville when I observed the vehicle in question. I was in the far right-hand lane. The vehicle was in the center going-forward lane. After the light turned green, the vehicle proceeded to make a left onto Hulmeville Road from the center lane.

MS. STRAM: And Officer, is that a permissible turn?

[OFFICER WILDSMITH]: It is not.

MS. STRAM: Why not?

[OFFICER WILDSMITH]: The vehicle completely overtook the left-hand lane, so if there was any vehicle to the left of them they woulda struck the vehicle.

MS. STRAM: So fair to say there's a turning lane for turning left?

[OFFICER WILDSMITH]: There is a specific turning lane to turn onto Hulmeville Road.

. . . .

MS. STRAM: And what did you do after you observed that Motor Vehicle Code violation?

[OFFICER WILDSMITH]: As you could see from the video, Hulmeville Road is a pretty busy street. It's not somewhere where I would particularly like to conduct a vehicle investigation just for my safety and the safety of the civilians, so I just stayed behind the vehicle and that's when the vehicle made another left onto Galloway Road. When it made the second left, it went into the travel lane of the opposing traffic slightly before I conducted a vehicle investigation.

ECF No. 49 at 16:22-24; 17:1-12; 20-25, 18:1-4. Officer Wildsmith was equipped with a body-worn camera,[3] and his vehicle was equipped with a dash camera.[4] *Id.* at 13. The dash camera did not capture the alleged traffic violation because it activates only after an officer engages the vehicle's lights or sirens. ECF No. 57 at 14 (July 16, 2025). However, it does visually record (without sound) the preceding 30 seconds. *Id.* Officer Wildsmith testified that he did not

---

[3] Gov. Exh. 2.
[4] Gov. Exh. 5.

immediately activate lights and sirens upon witnessing the improper left turn because it was not a safe place to pull over. *Id.* at 12. After observing the alleged violation, he queried the vehicle's tag in NCIC before initiating the stop. Nothing in the record suggests that the check disclosed any irregularities with the vehicle's registration or insurance. ECF No. 49 at 18.

During the initial phase of the evidentiary hearing—before the dash camera video was discovered and introduced—Officer Wildsmith testified regarding his observations of the vehicle occupants as follows:

> [OFFICER WILDSMITH]: I immediately observed, which piqued my awareness, I observed the passenger just making kind of aggressive movements. That's somethin' I saw a lot in the city working with Philadelphia.
>
> JUDGE: Define aggressive movements for me, Officer.
>
> [OFFICER WILDSMITH]: Just moving up and down in the seat, looking around. I could see the silhouette through the back window.
>
> . . . .
>
> MS. STRAM: Officer, what about those movements caused you to be more aware?
>
> [OFFICER WILDSMITH]: It's just not normal movements that someone would be making.
>
> . . . .
>
> MS. STRAM: When you made those observations, where were you in reference to the vehicle?
>
> [OFFICER WILDSMITH]: Directly behind the vehicle.
>
> MS. STRAM: Okay. And had you activated lights and sirens?
>
> [OFFICER WILDSMITH]: Not quite yet.
>
> MS. STRAM: All right. At what point did you activate lights and sirens?
>
> WITNESS: As soon as we were making the left from Hulmeville Road onto Galloway there's a shopping center on the right-hand side
>
> . . . .

> MS. STRAM: Could you, Officer, could you explain, could you show for the Court the gestures that you observed?
>
> . . . .
>
> [OFFICER WILDSMITH]: So seated in the passenger seat I would say this, leaning up and crouching down.
>
> MS. STRAM: Indicating for the record, Your Honor, standing, attempting to stand up in the seat looking left and looking right, and then making a crouching motion. And again, at what point did you make that observation?
>
> [OFFICER WILDSMITH]: I made that observation during the turn from Byberry Road onto Hulmeville and then I believe again right before the vehicle investigation

*Id.* at 18:21-25; 19:1-2, 10-13; 20:3-13; 28:16-17, 20-25; 29:1-4. The Incident Report prepared by Officer Wildsmith similarly described the passenger as "moving around aggressively and making several movements towards the floorboard of the vehicle." ECF No. 31-1 at 2. However, this Court's review of the dash camera footage showed that the vehicle had heavily tinted rear windows, which made it very difficult to see inside. Even assuming Officer Wildsmith's subsequent testimony at the bifurcated July hearing that the view into the vehicle was clearer in person than on the footage, the Court does not find credible his claim that he could see into the vehicle with the level of detail he described on the stand or in his report. *See* ECF No. 57 at 17. In reviewing the dashcam, the Court observed only indistinct movements from a vague silhouette in the passenger seat. The video did not depict anything resembling an "aggressive movement," nor did it show the passenger bending down or crouching at any point.

Officer Wildsmith testified at the initial June hearing that the vehicle committed a subsequent traffic violation when it "went into the travel lane of the opposing traffic slightly." ECF No. 49 at 18. The Court's review of the dashcam recording reflects that the vehicle did make a less-than-graceful turn. But Officer Wildsmith did not cite any particular provision of the Pennsylvania Motor Vehicle Code to support this assertion, and he made no mention of any

secondary traffic violation in his report. No traffic citations were ever issued to Vargas for either of the alleged violations. ECF No. 49 at 44.

Within moments of Officer Wildsmith initiating the traffic stop, several backup officers arrived on scene. Officer Wildsmith testified that upon exiting his police car, he immediately detected an "overwhelming stench of both burnt and fresh marijuana coming directly from the vehicle." *Id.* at 24:14-16. Yet during the more-than-30-minute encounter that followed, no officer on scene—including Wildsmith—made any mention of smelling or detecting marijuana.

As Officer Wildsmith and backup officer Corporal Broderick approached the vehicle together, Broderick informed Wildsmith that the driver, Domingo Vargas, had been arrested the previous day for DUI. Officer Wildsmith spoke with Vargas while Officer Broderick looked in through the passenger window, which was cracked open a few inches. *See* Gov. Exh. 5. Defendant Keith Wynn was the passenger occupant. ECF No. 49 at 22. When Vargas asked why he had been stopped, Corporal Broderick explained it was for making a turn from the wrong lane. *See* Gov. Exh. 5.  Vargas immediately grew agitated, accusing the officers of harassment. While Vargas searched for documents and continued to argue with Corporal Broderick, Wynn repeatedly and calmly reassured the officers that Vargas would provide the registration. *Id.*; ECF No. 49 at 27. Officer Wildsmith consistently characterized Wynn as cooperative, both during their encounter and in his testimony before this Court.

Vargas produced his license, which was run and returned clear. *Id.* at 27–28. About three minutes into the stop, Wildsmith asked Vargas to step out, confirmed he was unarmed, and directed him to continue speaking with Corporal Broderick. Vargas was not cited for any traffic violations or accused of any further wrongdoing. *Id.* at 49. Officer Wildsmith then requested Wynn's identification. Wynn, who had none, gave a series of false names. Vargas, shouting from outside,

6

told Wynn he need not speak and urged him to roll up his window. Wildsmith replied that Wynn was calmer than Vargas and "talking like an adult." Yet Wildsmith later testified that Wynn appeared "visibly nervous," "breathing heavily," and "slightly shaking." *Id.* at 30. Body-worn camera footage does not corroborate those claims.

After checking Wynn's false information, Wildsmith ordered him out and frisked him, handcuffing him on suspicion he might flee. *Id.* at 36. Wynn admitted possessing a small amount of marijuana, and Wildsmith observed marijuana in his pocket. *Id.* at 37-38. A search incident to arrest yielded marijuana, a .40 caliber bullet, and a vehicle key. The vehicle was then secured for a search warrant. *Id.* at 50. A further search of Wynn's person revealed six additional .40 caliber rounds concealed in a cigar wrapper. *Id.* at 52. Officers also learned Wynn had active warrants.[5] A subsequent search of the vehicle recovered a Smith & Wesson SW40V pistol loaded with 14 rounds from the unlocked glove box. *Id.* at 56.

## II.    LEGAL DISCUSSION

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop for a suspected violation of law is a "seizure" of the vehicle's occupants and must be conducted in accordance with the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 255–59 (2007). While the Fourth Amendment generally requires a warrant before the government may seize a person, officers are permitted to conduct brief investigatory stops, *Terry v. Ohio*, 392 U.S. 1, 22, 30 (1968), so long as they have "reasonable, articulable suspicion that criminal activity is afoot," *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Which is to say that the

---

[5] Officer Wildsmith testified that "the warrant was for robbery involving a weapon. I believe there was also a parole violation warrant for weapons offenses as well." ECF No. 49 at 58:3-9. The government offered no additional documentation to substantiate the nature of Wynn's warrants. Although the Court does not doubt the government's representation in its brief—that Wynn had active warrants in Philadelphia for aggravated assault, robbery, and firearms offenses, along with a state parole violation—those assertions are not evidence. On this record, the Court cannot make specific findings regarding the warrants.

officers must have "a particularized and objective basis for suspecting the particular person stopped" engaged in unlawful conduct. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)).

A defendant moving to suppress evidence bears the initial burden of establishing a basis for his motion. *See United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995); *see also United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013). The defendant may satisfy his burden by showing law enforcement conducted the challenged search or seizure without a warrant. *Johnson*, 63 F.3d at 245. In the case of a warrantless search, the government assumes the burden to show the search or seizure was reasonable. *Id.* (citing *United States v. McKneely,* 6 F.3d 1447, 1453 (10th Cir.1993)).

### 1.  Fourth Amendment Standing

While the Fourth Amendment defines the rights individuals hold, a threshold question is who may assert those rights in court. Because "Fourth Amendment rights are personal," they cannot be asserted vicariously. *Rakas v. Illinois*, 439 U.S. 128, 133 (1978). As the Third Circuit has explained, "standing" under the Fourth Amendment is not a jurisdictional doctrine but rather shorthand for asking whether the defendant's own constitutional rights are implicated. *United States v. Mosley*, 454 F.3d 249, 253 n.5 (3d Cir. 2006); *United States v. Stearn*, 597 F.3d 540, 551 n.11 (3d Cir. 2010).

The Fourth Amendment protects individuals' rights to be free from both unreasonable searches and unreasonable seizures. In the context of a traffic stop, the relevant inquiry depends on which right is invoked. A stop itself constitutes a seizure, while a contemporaneous search of the vehicle raises separate issues. To challenge a vehicle search, a defendant must show a reasonable expectation of privacy in the area searched. *United States v. Burnett*, 773 F.3d 122, 131

8

(3d Cir. 2014). Owners of searched vehicles typically have such an interest, but passengers generally do not, as a search of the car does not implicate their rights. *United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006). By contrast, all occupants—owners and passengers alike—are seized when a vehicle is stopped, and so each has standing to contest the legality of the stop. *Id.* If the stop is unlawful, evidence obtained during it must be suppressed unless the government shows the taint was purged. *Id.* at 251, 253 n.6. A defendant may therefore have "standing" to challenge the lawfulness of the stop (the seizure) but lack "standing" to challenge a search of the stopped vehicle. *See id.* at 253–55.

Wynn does not claim a privacy interest in the Chevy Equinox itself or in its glove compartment. Instead, his claim is that the stop was unlawful at its inception and unlawfully extended, making the seizure of his person unconstitutional. Because the firearm was discovered as a direct result of that seizure, he asserts it is suppressible as fruit of the poisonous tree. For a defendant who challenges his *seizure*, the "**s**tanding" inquiry is simple. "[A] Fourth Amendment seizure of every occupant of a vehicle occurs the moment that vehicle is pulled over by the police. The legality of the seizure depends upon the legality of the traffic stop." *Id.* at 253 n.6.

Here, because Officer Wildsmith conducted the traffic stop without a warrant, Wynn satisfies his threshold burden and has standing to move for suppression based on the allegedly unlawful traffic stop. *See Mosley*, 454 F.3d at 253. With that, the government has the burden to justify the stop by a preponderance of the evidence. *See Heien*, 574 U.S. at 60 (quoting *Navarette*, 572 U.S. at 396).

### 2.  Officer Wildsmith's Credibility and the Legality of the Traffic Stop

In deciding a motion to suppress evidence, the trial court determines the credibility of witnesses. *United States v. Davis,* 514 F.2d 1085, 1088 (7th Cir. 1975) (quoting *United States v.*

*Conner,* 478 F.2d 1320, 1323 (7th Cir. 1973)). As the finder of fact, the court can accept or reject any or all of a witness's testimony. *United States v. Murphy,* 402 F. Supp. 561, 569–70 (W.D. Pa. 2005) (citing *United States v. Conley,* 859 F. Supp. 830 (W.D. Pa. 1994)). Credibility determinations "are to be made in consideration of numerous factors, including . . . the witness's ability to accurately recollect the matters at hand [and] ultimately, the extent to which [the testimony] withstands a common sense test of reason and logic." *Id.* The credibility of a defendant who testifies on his own behalf should be "judged in the same way as any other witness," and likewise, a witness should "not to be judged more or less credible because the witness is a law enforcement officer." *Id.* (citations omitted).

The government bears the burden of establishing that a traffic stop was justified at its inception. Officer Wildsmith made clear during his testimony that his basis for initiating the traffic stop was a motor vehicle code violation (or violations). A traffic stop is "constitutional when it is based on an 'articulable and reasonable suspicion that . . . either the vehicle or an occupant' has violated the law." *Johnson,* 63 F.3d at 245 (quoting *Delaware v. Prouse,* 440 U.S. 648, 663 (1979)). In *Whren v. United States,* the Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime. 517 U.S. 806, 810, 813 (1996).

The Court recognizes that even if Officer Wildsmith had stopped Wynn for a pretextual reason, such a stop would not violate the Fourth Amendment so long as an actual traffic violation occurred. *Id.* at 813. The problem here, however, is not pretext but proof. The government's proof of the violation rests entirely on Officer Wildsmith's testimony that he observed Vargas make an improper left turn, and the Court cannot find that testimony credible. Without reliable evidence

that a violation in fact occurred, the government has not carried its burden of establishing a lawful basis for the stop. *See Johnson*, 63 F.3d at 245.

Before turning to the legality of the traffic stop, the Court emphasizes that in making credibility determinations it is free to accept all, part, or none of a witness's testimony. *See Gov't of the Virgin Islands v. Gereau*, 502 F.2d 914, 921 (3d Cir. 1974) (holding that "credibility determinations are uniquely the province of the fact-finder"); *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005) ("The court, as finder of fact, is free to accept or reject any or all of a witness's testimony"). The Court has carefully considered Officer Wildsmith's testimony in its entirety and in light of the full record. While many of the credibility concerns arise from later phases of the encounter, those inconsistencies and omissions are nonetheless relevant to the Court's overall assessment of his reliability. Viewed in the totality, these broader credibility problems reinforce the Court's conclusion that his account of observing a motor vehicle code violation at the outset is not credible.

The Court identified repeated inconsistencies between Officer Wildsmith's testimony and the record, along with embellishments that appeared calculated to provide constitutional justification for his actions. These deficiencies lead the Court to view with skepticism his assertion that he observed a traffic violation before initiating the stop. His failure to promptly activate lights and sirens after allegedly witnessing the violation further undermines his account. The record is also notable for what it lacks: despite Wildsmith's extensive narcotics training, neither he nor any other officer reported detecting the odor of marijuana during the entirety of the encounter. This absence contradicts Wildsmith's testimony that the smell was "overwhelming" at the time. Because the government's evidence of a traffic violation relies entirely on testimony the Court finds unreliable, it has not carried its burden to establish a lawful basis for the initial stop.

The government also points to the fact that the vehicle briefly swerved following the first improper turn, which Officer Wildsmith characterized as an additional traffic violation. But Officer Wildsmith cited no provision of the Pennsylvania Motor Vehicle Code to support that assertion, did not issue a citation for the alleged infraction, and omitted any reference to it in his incident report. The absence of statutory grounding, contemporaneous documentation, or corroboration renders this testimony insufficient to establish a lawful basis for the stop. His failure to issue any traffic citations at all to Vargas casts further doubt on his testimony.

As set forth in the findings of fact above, the Court observed significant discrepancies between the officer's testimony and the video evidence, which cannot be reconciled. Officer Wildsmith's account is unsupported by any independent evidence—there is no video evidence, no corroborating officer, and no traffic citations; and the government's aerial map introduced during the hearing contained no discernible traffic markings from which the Court could verify the presence of a left-turn-only sign. Absent credible testimony or corroboration, the government has not met its burden to establish that the stop was justified by reasonable suspicion. Accordingly, the traffic stop was invalid under the Fourth Amendment.

### 3. The Evidence Seized Was Fruit of the Poisonous Tree

There can be no serious dispute that an unlawful traffic stop constitutes a Fourth Amendment violation that triggers the exclusionary rule. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). "[W]hen a vehicle is illegally stopped by the police, no evidence found during the stop may be used by the government against any occupant of the vehicle unless the government can show that the taint of the illegal stop was purged." *Mosley*, 454 F.3d at 251.

The Court will briefly address the government's argument that Wynn's outstanding arrest warrants attenuated the connection between the unlawful traffic stop and the seized evidence. *See*

ECF No. 54; *Utah v. Strieff*, 579 U.S. 232 (2016).[6] The government bears the burden of producing competent evidence to establish attenuation, *Mosley*, 454 F.3d at 251, and the record here is insufficient to carry that burden. The only reference to outstanding warrants comes from Officer Wildsmith's testimony. This Court has already found his testimony not credible with respect to the basis for the stop, and the government introduced no warrant records, certified documents, or other independent corroboration to establish that such warrants in fact existed at the time of the stop. Absent reliable evidence of an intervening warrant, the Court cannot apply the attenuation doctrine. The government has therefore failed to demonstrate that the taint of the unlawful stop was purged.

### III.    CONCLUSION

For the reasons set forth above, this Court will grant Defendant Wynn's motion to suppress the evidentiary fruits of his illegal seizure.

---

[6] The government did not raise an attenuation theory in its written response to Wynn's motion to suppress or during the two-day evidentiary hearing on the motion. The argument appeared for the first time in the government's supplemental brief—despite the Court's order directing the parties to limit that briefing to the issue of standing. Wynn therefore argues that the government has forfeited, if not waived, any reliance on attenuation. The Court does not address whether the government preserved the argument because it can't even reach the merits in the absence of a sufficient record.